**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Cara WOODS, Jr., et al., Defendants-Appellants.**

**Nos. 74–2337 to 74–2353.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 7, 1975.

Decided Oct. 8, 1976.

Rehearing and Rehearing En Banc Denied Feb. 2, 1977.

James K. O'Malley, Livingston, Miller, O'Malley & Clark, P. C., Pittsburgh, Pa., S. Allen Early, Jr., Wilfred C. Rice, Milton R. Henry, Henry, Smith, Sabbath & Dillard, Detroit, Mich., for defendants-appellants.

Frederick S. Van Tiem, U. S. Atty., Laurence Leff, Strike Force, Detroit, Mich., Reuben H. Wallace, Peter M. Shannon, Jr., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before CELEBREZZE, McCREE and MILLER,* Circuit Judges.

McCREE, Circuit Judge.

We have consolidated for consideration the appeals of seventeen defendants from their convictions in the Eastern District of Michigan. Each appellant had been charged in one of two similarly worded indictments with sixteen violations of federal narcotics laws, 21 U.S.C. §§ 841 and 846. One indictment, hereinafter the Jackson indictment, named fifteen unindicted co-conspirators and seventeen defendants, including appellants Eddie Jackson, Herbert Bell, Ronald Garrett, Samuel Horne, Alphonzo Jones, Fairh Lee Riggs, Charles Ru-

dolph, Charles Cavanaugh, Laticia Burns, Maurice Thompson, Leo Hurt, George Blair, and Courtney Brown. The other indictment, hereinafter the Kilpatrick indictment, named as defendants the fifteen persons who were unindicted co-conspirators in the earlier indictment, including appellants Willie Kilpatrick, Joseph Weaver, James Weaver, and Cara Woods. The persons named as defendants in the first indictment were named as unindicted co-conspirators in the second indictment. Count 1 of both indictments charged a single conspiracy that continued from September to December 1971 to manufacture, distribute, and possess heroin and cocaine in violation of 21 U.S.C. § 846. Counts 2 through 16 charged substantive violations of 21 U.S.C. § 841 committed during the period from October to December 1971.

One of these cases was assigned to District Judge John Feikens for trial, and the other to District Judge Philip Pratt, both of whom are Judges of the Eastern District of Michigan. Consolidated pretrial evidentiary hearings were held to consider various motions raised by appellants. In addition to waiving their right to trial by jury, the various defendants also agreed to proceed with a simultaneous bench trial before Judges Feikens and Pratt in order to avoid the necessity of two separate trials involving identical proofs.

Although the proceedings in the two separate cases were conducted simultaneously, each judge was solely responsible for all rulings affecting each defendant in the case assigned to him, and each judge entered separate findings and conclusions regarding the guilt or innocence of each defendant in the case assigned to him.

At the conclusion of their joint bench trial, all appellants were found guilty on multiple counts and received sentences ranging from three years' imprisonment to twenty years' imprisonment.[1] Appellants

---

* The Honorable William E. Miller died on April 12, 1976 and did not participate in this opinion.

1. The following appellants were convicted and sentenced by Judge Pratt: Willie Lee Kilpatrick was convicted on counts 1, 3, 4, 6 through 16, and sentenced to concurrent terms of six years' imprisonment on each count, subject to the parole provisions of 18 U.S.C. § 4208(a)(2), with a special parole term of three years. In

Kilpatrick, James Weaver, Joseph Weaver, Jackson, Brown, Blair, Bell, Riggs, Garrett, Horne, Jones, Rudolph, Cavanaugh, and Hurt were convicted on counts 1, 3, 4, and 6 through 16. Cara Woods was convicted on counts 8 and 9. And appellants Burns and Thompson were convicted on counts 2 and 5.

The simultaneous trial conducted in the district court was an understandable effort to accommodate indictments of the magnitude and complexity that were obtained here by the government. Nevertheless, this procedure has produced an appellate record of extraordinary size with the consequence that oral argument has been of less than usual assistance to us in analyzing and deciding the issues presented on appeal.

Instead of beginning our opinion with a narration of the facts, we shall consider the facts giving rise to each separate appellate issue in our discussion of it.

## I. WERE DEFENDANTS PROPERLY INDICTED?

Appellants[2] challenge the validity of the indictments on several grounds. First, they contend that the grand jury was improperly selected. Second, they contend that the information intercepted by the wiretaps was placed before the grand jury before the government complied with 18 U.S.C. § 2518(10)(a). Third, they argue that the government misused the grand jury to intimidate persons whom the government intended to call later as witnesses in appellants' criminal trials. Finally, appellants urge that the indictments were multiplicitous.

### A. The Selection of the Grand Jury.

■ Appellants argue that the selection of the grand jury venire violated the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.*, as well as the selection plan

addition, the court imposed a $2,000 committed fine on count 1. James Reginald Weaver and Joseph Leon Weaver were convicted on counts 1, 3, 4, 6 through 16, and sentenced to concurrent terms of four years' imprisonment on each count, subject to the parole provisions of 18 U.S.C. § 4208(a)(2), with a special parole term of three years. Cara Woods, Jr. was convicted on counts 8 and 9, and sentenced to concurrent terms of six years' imprisonment on each count under the parole provisions of 18 U.S.C. § 4208(a)(2), with a special parole term of three years. The court also imposed a $1,000 committed fine on each count.

The remaining appellants were convicted and sentenced by Judge Feikens. Appellants Jackson, Brown, Blair, Bell, Riggs, Garrett, Horne, Jones, Rudolph, Cavanaugh, and Hurt were convicted on counts 1, 3, 4, 6 through 16, and received the following sentences. Eddie Jackson was sentenced to concurrent fifteen-year terms of imprisonment on counts 1, 3, 4, 6, 7, 8, 9, 10, 11, and 12, to be served consecutively with concurrent five-year terms of imprisonment imposed on each of counts 13 through 16, and a special three-year parole term. A committed fine of $5,000 on each count was also imposed. George Blair and Courtney Brown were sentenced to concurrent terms of fifteen years' imprisonment on each of counts 1, 3, 4, 6, 7, 8, 9, 10, 11, and 12, to be served consecutively with concurrent terms of 2½ years' imprisonment on each of counts 13 through 16, with a special three-year term of parole, and a committed fine of $5,000 on each count. Ronald Garrett received concurrent terms of 12½

years' imprisonment on each count, with a special parole term of three years and a committed fine of $3,000 on each count. Charles Rudolph and Herbert Bell received concurrent terms of ten years' imprisonment on each count, with a special parole term of three years, and a committed fine of $1,000 on each count. Samuel Eugene Horne, Alphonzo Jones, Charles Cavanaugh, and Leo Hurt were given concurrent terms of seven years' imprisonment on each count, with a special parole term of three years, and committed fines of $1,000 on each count. Fairh Lee Riggs was sentenced to concurrent terms of seven years' imprisonment on each count, with a special parole term of three years, both to be served concurrently with a sentence imposed by the district court for the Eastern District of New York, which Riggs was then serving.

Appellants Thompson and Burns were convicted on counts 2 and 5, and were sentenced as follows: Maurice Thompson received concurrent terms of five years' imprisonment on each count, with a special parole term of three years' imprisonment to be served at a federal facility with a drug abuse program. Laticia Burns received concurrent terms of three years' imprisonment on each count to be served at a federal facility having a drug abuse program, to be followed by a special three-year parole term.

2. A number of separate briefs were filed on appeal. Unless otherwise noted, we will treat each argument as applicable to all appellants.

adopted in the Eastern District of Michigan because an improper voting list was used, an unauthorized person took part in the compilation of the master jury wheel, and a jury clerk took official work out of the office to her home.

We decided these identical issues in *United States v. McNeal,* 490 F.2d 206 (6th Cir. 1973), *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). At the district court level, the parties in *McNeal* stipulated that precisely the same challenges to the grand jury venire had already been submitted to Judge Feikens and to Judge Pratt in the Kilpatrick and Jackson cases. The parties in *McNeal* agreed to be bound at the district court level by the rulings of Judge Pratt and Judge Feikens, and in accordance with their rulings, the district court denied the motion to quash the indictment in *McNeal.* On review we held that "there was no 'substantial failure to comply with the provisions' of the act." 490 F.2d 207. We hold that our determination in *McNeal* is dispositive of these appeals as well, since not only the same issues but also the same facts giving rise to them are before us again.

### B. The Presentation of Wire Interception Evidence Before the Grand Jury.

Immediately after their arrest, several appellants filed a motion to suppress the wiretap evidence that they believed might have formed a basis for their arrests. They also sought disclosure of the applications and orders for the interceptions. In addition, they moved to enjoin the government from holding a preliminary hearing or presenting the wiretap evidence to a grand jury until ten days after obtaining the disclosure they sought. The government opposed the motions, but neither admitted nor denied the legality of the wire interceptions. After hearing oral arguments, the district court held that the government could not present wire interception evidence at a preliminary hearing without disclosure, but otherwise the district court denied the motions.

On the day scheduled for the preliminary hearing, appellants were indicted by the grand jury, which heard the testimony of Special Agent Garibotto and evidence from the wire interceptions. The return of the indictments made it unnecessary to conduct the preliminary hearing.

Appellants contend that this procedure violated 18 U.S.C. § 2518(9) and (10)(a) and 18 U.S.C. § 3504. Section 2518(9) provides that:

The contents of any intercepted wire or oral communication or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved. This ten-day period may be waived by the judge if he finds that it was not possible to furnish the party with the above information ten days before the trial, hearing, or proceeding and that the party will not be prejudiced by the delay in receiving such information.

Section 2518(10)(a) provides:

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

Finally, § 3504 states:

(a) In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regula-

tory body, or other authority of the United States—

 (1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act . . . .

Appellants contend that these sections authorized their motions to suppress, required the government to affirm or deny the legality of the wire interceptions, and prohibited the government from relying on the evidence gathered as a result of the interceptions until these requirements were satisfied. Accordingly, they contend that their indictments must be quashed because the government presented this evidence to the grand jury before it replied to their challenge to the interceptions. 18 U.S.C. § 2515 provides that no intercepted wire communication or evidence derived therefrom may be "received in evidence . . . in any . . . proceeding . . . before any . . . grand jury . . . if the disclosure of that information would be in violation of this chapter."

■ We hold that the government was not required to comply with § 2518(9) or to affirm or deny the illegality of the interception before it could introduce the intercepted communications before the grand jury, nor were appellants entitled to prevent the presentation of this evidence to the grand jury even if the interception were unlawful.

The legislative history of § 2518(9) demonstrates that Congress did not intend the ten-day disclosure requirement to apply to grand jury proceedings. The Senate Report section-by-section analysis provides that:

"Proceeding" is intended to include all adversary type hearings. It would include a trial itself, a probation revocation proceeding, or a hearing on a motion for reduction of sentence. *It would not include a grand jury hearing.* Compare

*Blue v. United States,* 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966). U.S.Code Cong. & Admin.News 2195 (1968).

The Congressional history of § 2518(10)(a) demonstrates that this section was not intended to permit a defendant to challenge the evidence presented to the grand jury:

Paragraph (10)(a) . . . must be read in connection with sections 2515 and 2517, discussed above, which it limits. It provides the remedy for the right created by section 2515. *Because no person is a party as such to a grand jury proceeding, the provision does not envision the making of a motion to suppress in the context of such a proceeding itself. Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible by an individual.* (*Blue v. United States,* 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 [1966].) *There is no intent to change this general rule.* It is the intent of the provision only that when a motion to suppress is granted in another context, its scope may include use in a future grand jury proceeding.

U.S.Code Cong. & Admin.News 2195 (1968). [Emphasis added.]

The Supreme Court's opinion in *Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972) analyzes §§ 2518(10)(a) and 3504, and supports the conclusion that they do not authorize a defendant to suppress evidence before the grand jury on the grounds that it was intercepted illegally. Nor is the government required to affirm or deny the legality of the interception. In *Gelbard* the Court held that a grand jury witness could refuse to answer questions that were based upon illegal interceptions, and could defend against a contempt charge under 18 U.S.C. § 2515. Section 2515 bars the use as evidence before official bodies of the contents and the fruits of illegal interceptions. The Court held that in the context of § 3504, which states the procedures by which aggrieved persons may challenge illegally procured evidence, a "party aggrieved"

*can only be a witness,* for there is no other "party" to a grand jury proceeding. Moreover, a "claim . . . that evidence is inadmissible" can only be a claim that the witness' potential testimony is inadmissible.

408 U.S. 54, 92 S.Ct. 2364. [Emphasis added.]

The Supreme Court drew a careful distinction between a *witness* before the grand jury, who it held may refuse to answer questions based upon illegal interceptions, and a defendant or potential defendant. The Court held that:

The congressional concern with the applicability of § 2518(10)(a) in grand jury proceedings, so far as it is discernible from the Senate report, was apparently that defendants and potential defendants might be able to utilize suppression motions to impede the issuance of indictments: "Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible by an individual. [*United States v. Blue,* 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966).] There is no intent to change this general rule." S.Rep. No. 1097, 90th Cong., 2d Sess., 106 (1968); U.S.Code Cong. & Admin.News, p. 2195. The "general rule," as illustrated in *Blue,* is that a defendant is not entitled to have his indictment dismissed before trial simply because the Government "acquire[d] incriminating evidence in violation of the [law]," even if the "tainted evidence was presented to the grand jury." 384 U.S. at 255 and n. 3, 86 S.Ct. 1419; see *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). But that rule has nothing whatever to do with the situation of a grand jury witness who has refused to testify and attempts to defend a subsequent charge of contempt.

408 U.S. 59–60, 92 S.Ct. 2367.

Accordingly, we hold that appellants were not entitled to contest the legality of the intercepted communications before the grand jury. Appellants contend, however, that they had a right to contest the admissibility of wiretap evidence at the scheduled preliminary hearing, and that the government could not deprive them of this right by the sudden tactic of obtaining an indictment.

Our court has repeatedly held that if "a grand jury returns a true bill prior to the time a preliminary hearing is held, the whole purpose and justification of the preliminary hearing has been satisfied." *United States v. Mulligan,* 520 F.2d 1327, 1329 (6th Cir. 1975). A defendant has no right to have a preliminary hearing if a grand jury indictment is returned. Although we have recognized that a preliminary hearing may as a practical matter provide a defendant with an irreplaceable opportunity for discovery, a defendant has no absolute right to these ancillary benefits. For example, in *Mulligan* we held that defendants, who wanted to cross-examine a key government witness prior to trial, suffered no prejudice when their preliminary hearing was continued to permit the government to obtain a grand jury indictment in the interim. Accordingly, we hold that appellants suffered no *legal* prejudice when the government proceeded by indictment, rather than by a preliminary hearing at which appellants could have contested the legality of the wire interceptions pursuant to 18 U.S.C. §§ 2518(10)(a) and 3504.

C. Improper Use of the Grand Jury.

Appellants also assert that the government improperly used the grand jury to discover and preserve evidence to be used at the trial of their already pending indictments. They assert that both Burt and Nabors were called before the grand jury to testify against appellants *after* appellants' indictment. The government concedes that it is improper to use a grand jury solely to prepare a pending indictment for trial. *Beverly v. United States,* 468 F.2d 732 (5th Cir. 1972); 8 Moore's Federal Practice ¶ 6.04. But it contends that the record con-

tains no support for appellants' claim that Burt and Nabors were called only to prepare pending indictments for trial. Additionally, the government urges that appellants have not demonstrated that any prejudice resulted from the alleged misconduct, and it contends that only Nabors and Burt have standing to raise the issue.

■ A presumption of regularity attaches to a grand jury's proceedings and appellants have the burden of demonstrating that an irregularity occurred. *Universal Manufacturing Co. v. United States*, 508 F.2d 684 (8th Cir. 1975); *Beverly v. United States*, 468 F.2d 732 (5th Cir. 1972). Moreover, we agree with the observation made by the First Circuit that:

> grand jury proceedings cannot be policed in any detail. It is a price we pay for grand jury independence that sometimes people are indicted on the basis of evidence tainted in part by hearsay, *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), or of illegally obtained evidence, *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). Nor is a grand jury narrowly confined in its objectives, *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), *Blair v. United States*, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919).

*United States v. Doe*, 455 F.2d 1270, 1274 (1st Cir. 1972).[3] Accordingly, in *United States v. George*, 444 F.2d 310, 314 (6th Cir. 1971) we held that "[s]o long as it is not the sole or dominant purpose of the grand jury to discover facts relating to [a defendant's]

pending indictment, the Court may not interfere with the grand jury's investigation."

■ Neither appellants nor the government have cited to us any portion of the record in which appellants presented this claim to the district court, and we have searched the voluminous record to no avail. However, assuming that this issue is properly before us, we hold that appellants have presented nothing beyond their own unproved suspicions to prove that Burt and Nabors were improperly summoned before the grand jury for the sole or dominant purpose of preparing the pending indictments for trial. Portions of the testimony at trial suggest that after appellants were indicted, Burt and Nabors did testify before the grand jury regarding some of the matters at issue in appellants' trial. However, appellants have made no showing that Burt and Nabors were not called in order to determine whether other persons not yet indicted were also involved in the conspiracy under investigation. The indictments charged that appellants conspired with "divers other persons whose names are to the Grand Jury unknown," and the grand jury could properly call witnesses in an attempt to identify these persons. *United States v. Beverly, supra.*

## D. Multiplicity.

■ Appellants allege that they were improperly indicted and convicted of five separate acts of possession with intent to distribute a controlled substance,[4] when the proofs showed that all the narcotics in question were found at the Hubbell Street

---

3. The court also recognized, however:

> On the other hand, we are sensitive to the possibilities of abuse of the grand jury process which are inherent in the present situation. As Moore has observed, "The government has at its disposal one of the most effective discovery mechanisms yet devised—the grand jury. This body may call witnesses under compulsory process and examine them in secret under oath, unhampered by the rules of evidence or an adversary counsel's cross-examination, or in the case of a 'prospective defendant' by Fifth Amendment immunity. [citations omitted]."

8 Moore's Federal Practice ¶ 16.08[1], at 16–100 (2d ed. 1970). 455 F.2d at 1275.

4. The counts charged:

> Count 12—659.66 grams of cocaine hydrochloride, with a strength of 15.8%.
> Count 13—681.80 grams of heroin hydrochloride with a strength of 19.3%.
> Count 14—45.30 grams of cocaine hydrochloride with a strength of 5.1%.
> Count 15—14.66 grams of cocaine hydrochloride with a strength of 32.7%.
> Count 16—2,589.93 grams of heroin hydrochloride with a strength of 58.1%.

house, and that the intercepted wire communications indicated that appellants had just received a *single* shipment. Accordingly, appellants contend that the fragmentation into multiple counts of a single act of possession of narcotics violated their right to due process.

Apparently appellants raise this contention for the first time on appeal. The government contends that under F.R. Crim.P. 12(b)(2) appellants' failure to make the claim that the indictment was multiplicitous by pretrial motion constituted a waiver of this objection. F.R.Crim.P. 12(b)(2) requires that "[d]efenses and objections based on defects . . . in the indictment or information" "*must* be raised" prior to trial. (Emphasis added.) However, F.R.Crim.P. 12(f) also provides that the "[f]ailure by a party to raise defenses or objections or to make requests which must be made prior to trial . . . shall constitute waiver thereof, *but the court for cause shown may grant relief from the waiver.*" (Emphasis added.)

Since it is not entirely clear from the general averments in the indictments that the narcotics referred to in counts 12 through 16 were all seized from the Hubbell Street house, there may have been good cause for appellants' failure to have raised this issue before the district court until the government presented its case. However, since appellants failed to present this objection to the district court even after the close of the government's case, when the factual basis of their objection was apparent, we hold that they waived this objection under F.R.Crim.P. 12(f).

Appellants also argue that counts 6 and 10 and counts 7 and 11 are multiplicitous, because they charge both distribution and possession with intent to distribute the same quantities of drugs. They urge that possession with intent to distribute is a lesser offense included within distribution. Again, it appears that appellants did not raise this contention before the trial court, and we hold, accordingly, that it was waived. F.R.Crim.P. 12(f).

## II. WAS THERE GOVERNMENT MISCONDUCT THAT REQUIRES REVERSAL?

Appellants contend that shocking governmental misconduct requires the reversal of their convictions. They contend first that a sham defendant was indicted in order to penetrate their defense. Second, they argue that before their trial, the government improperly disclosed critical information to the press. Third, they complain that the government improperly intruded into the marital relationship of appellant Blair and Ruth Ann Burt, to induce her to testify against appellants. Finally, they argue that the government improperly met with Burt and Blair without any notice to Blair's attorney.

### A. The Sham Defendant.

■ Appellants contend that the government's misconduct in indicting Roosevelt Nabors as a "sham defendant" requires the reversal of their convictions. They contend that the sham nature of the indictment of Nabors, who served as a government informer, is shown by the fact that payments to him continued even after the indictment. Further, he was called to testify before the grand jury about the case in which he was charged after he had been indicted, and defense counsel Milton Henry, who had filed an appearance on behalf of Nabors as well as most of the other defendants, was not notified. Appellants argue that the sham indictment of Nabors violated the fundamental fairness guaranteed by the due process clause, and violated their right to counsel by introducing a government agent into the defense.

Nabors testified that when he first began working with the Bureau of Narcotics and Dangerous Drugs (BNDD), he was told that his cooperation would be communicated to the court in connection with charges pending against him for attempted murder and the unlawful driving away of an automobile. He also stated that no other promises had been made to him. He stated that while he was working with the BNDD he was paid approximately $1,500 for living

expenses. He testified that he was expected to help to set up arrangements so that government special agents could make purchases directly from members of the Jackson organization. He was not authorized by them to make purchases on his own. Nevertheless, he testified that without the knowledge or authorization of the government, he sold $600 worth of heroin that he had received from the Jackson organization on consignment. He said that when he was arrested, he was told that he was being prosecuted because of this independent transaction.

Agent Garibotto testified that during a review of tape recordings of the intercepted communications after the December 15 arrests at Hubbell Street, government agents discovered that, without government authority, Nabors had called and arranged to pick up at least one quantity of heroin, and that he had sold it. Garibotto testified that Nabors was indicted in good faith for this unauthorized part in the conspiracy. Although he had been severed from the other defendants before trial, Garibotto testified that the government retained the right to try him separately, and that at the time of the trial of the other defendants, no final decision had been made whether he would be brought to trial or not. He said that he planned to make no recommendations one way or the other. He stated that he had authorized a payment to Nabors after his testimony before the grand jury so that Nabors could stay out of sight in a motel. He said that after the indictment he had not used Nabors again as an informant, but he believed that others in the BNDD might have done so.

Although appellants claim that Nabors was indicted in order to penetrate the defense and learn its tactics, they have presented little evidence that Nabors was involved in appellants' common defense. Although Attorney Milton Henry filed an appearance on behalf of Nabors as he did for all the other defendants, the court's records demonstrate that counsel was also assigned for Nabors on January 25, before he was called before the grand jury. More-over, on the government's motion, Nabors' trial was severed from that of the other defendants on the ground that the government expected to call him as a witness. Nabors testified that when he was arrested, he did *not* meet all of the other defendants, talk to them, or know their names. He did recall that he spoke briefly to only one of the appellants, Kilpatrick.

We do not think that the record shows any government misconduct. Appellants have not sustained their burden of showing that Nabors, who was severed for trial, and for whom the district court appointed separate counsel shortly after his arrest, actually intruded into the attorney-client relationship between appellants and their counsel.

B. Pretrial Publicity Resulting from Governmental Disclosures.

Appellants make two contentions about pretrial publicity. First, they contend that the government improperly disclosed to the press information gathered by wire interceptions. Second, they contend that the volume of pretrial publicity made it impossible for them to receive a fair trial.

1. Pretrial Disclosure of Intercepted Communications.

Appellants strenuously contended both in the district court and in briefs and argument on appeal that the government made improper pretrial disclosures of critical information to the press. They urge that pretrial newspaper articles contained "detailed recitals of wire interceptions, which could only have been furnished by the government." The newspaper article principally relied upon to support this contention indicates on its face that its source was a "26-page affidavit [by] an agent of the Federal Bureau of Narcotics and Dangerous Drugs." Moreover, in their amended motion to dismiss for prosecutorial misconduct, appellants specifically argued that it was improper for the government to use information from wire interceptions in an affidavit for a search warrant, and "then place that affidavit in the custody of a court clerk, without first making provision for its

protection from disclosure as required by the plain mandate of the Federal Law."

Thus we understand the gist of appellants' argument to be that the government had a duty to prevent unauthorized disclosures of their intercepted communications, and that the government's failure to prevent disclosure of the information recited in the affidavit requires the dismissal of the charges against them. Appellants rely upon 18 U.S.C. § 2517, which lists situations in which "[a]ny investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication" may disclose or use the information. Subsection (1) permits disclosure to another investigative or law enforcement officer to the extent necessary for the performance of both officers' official duties. Subsection (2) provides generally that intercepted information and communications may be disclosed "to the extent . . . appropriate" to the officer's official duties. And subsection (3) permits disclosure where the officer is giving testimony under oath in a state or federal criminal or grand jury proceeding.[5]

Appellants contend that any disclosure not explicitly authorized by § 2517 is illegal, and they argue that § 2517 did not authorize either investigative or court personnel to disclose the contents of their intercepted communications to the press. Accordingly, they urge that the disclosure to the newspapers was illegal and that the only appropriate remedy is the dismissal of the indictments.

The government argues that subsection (2) authorized government agents to disclose the contents of intercepted communications in an affidavit for a search warrant. Then F.R.Crim.P. 41(g) required the magistrate before whom the warrant was re-turned to file the warrant "and all other papers in connection therewith" with the clerk of the district court, where they became a matter of public record. The government argues that dismissal of the charges against appellants is not warranted merely because of the government's failure to take extraordinary measures to seek restriction of access to the court files, especially when appellants made no request for such a restriction of access. The government notes that the wiretap statutes provide three remedies—suppression,[6] civil damages,[7] and criminal penalties.[8] The remedies for unlawful *disclosure* of intercepted communications are civil damages and criminal penalties. The detailed provisions of the Act contain no provision for the dismissal of pending criminal charges.

We agree with the government that appellants have failed to demonstrate any circumstances that warrant dismissal of the charges against them. However, in view of the congressional intention to protect individual privacy, it would be better practice for the government to request, as a matter of course, that the district court restrict access to documents filed with the court that contain intercepted communications.

2. Pretrial Publicity and the Right to a Fair Trial.

Appellants also contend that the pretrial publicity about their cases was so pervasive and inflammatory that they could not receive a fair trial. However, appellants were tried not by a jury, but by experienced district judges. In these circumstances appellants must show that the pretrial publicity resulted in some actual prejudice, and they have failed to do so. Moreover, if appellants believed that one or both of the district judges could not try

---

**5.** Subsection (5) provides:

Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

**6.** 18 U.S.C. § 2515.

**7.** 18 U.S.C. § 2520.

**8.** 18 U.S.C. § 2511.

them impartially, the remedy was to seek disqualification. 28 U.S.C. § 144.

## C. Interference with George Blair's Marriage to Ruth Ann Burt. -

■ Appellant George Blair contends that in violation of the public policy that protects marriage, government agents intentionally broke up his marriage with Ruth Ann Burt in order to procure her testimony as a government witness. He contends that the convictions of all the appellants rest in large part on Burt's tainted testimony, and should be reversed.

Blair first presented this objection to the district court in a post-trial affidavit in support of his motion for a new trial. Blair did not testify at trial, nor did he present any witnesses who testified that the government "alienated" his marriage to Burt. The district court held that:

there was no credible evidence indicating any improper conduct on the part of the government; rather the credible evidence, including testimony of defendant's former wife, Ruth Ann Burt, indicated the government did not act improperly.

We hold that the record adequately supports the trial court's finding, which is not clearly erroneous.

## D. The Government's Meeting with Blair and Burt.

■ Both before the district court and on appeal, appellants argue that the government improperly met with appellant George Blair and his then wife Ruth Ann Burt without the presence of, or even notification to, Blair's attorney. Appellants urge that the meeting in the absence of counsel was fundamentally unfair. Moreover, since this was a complex conspiracy case, and Blair's statements could be used to incriminate other defendants found to be co-conspirators, appellants argue that the meeting violated the right to counsel of all of the appellants. In support of their contentions appellants cite *State v. Britton*, 203 S.E.2d 462 (W.Va.1974), as authority for reversing a conviction when the prosecution

met with a defendant in the absence of his attorney. They contend that the circumstances of the secret meeting with Blair and Burt "irremediably tainted" her testimony.

According to Burt's testimony,[9] about five months after Blair's arrest, when she and Blair were not living together, Agent Garibotto communicated with her about testifying before the grand jury, and she said that she would think about it. Later she called Garibotto and arranged to meet him, telling him that she would bring Blair. When they met, she said that she wanted to negotiate immunity for Blair, and Garibotto replied that he would have to consult the government attorney handling the case. The critical meeting was held at the Ramada Inn. Blair, Burt, Garibotto, and government attorney Wampler were all present. Burt stated that no one took notes, and she did not believe that the conversation was recorded. She did not recall whether anyone gave Blair the *Miranda* warnings. In Blair's presence she told the government agents a good deal about her knowledge of the narcotics organization and Blair's activities. When she was asked if Blair took part in the conversation, she said, "in some areas, yes." She stated that he answered some questions. Burt said that she then asked if Blair could be given immunity in return for her testimony, but that they were told that Blair would not be given immunity unless he testified himself.

At the time of the meeting, Blair and virtually all of those indicted were being represented by one attorney, Milton Henry. The government did not inform Henry of the meeting, nor was Blair asked to contact Henry himself.

The district court conducted an inquiry into this matter at a post-trial hearing. Government attorney Wampler testified that he had believed that it was Blair's wish that neither his co-defendants nor their common counsel learn of his efforts to obtain immunity in return for Burt's testimony. Moreover, he stated that Blair said

**9.** Blair did not testify at the trial.

little at the meeting, and that the government "didn't rely on anything that was said at the meeting and that's very true."

The trial court held that the government "offered no evidence at trial resulting from any statements made by Miss Burt or defendant Blair at the meeting . . . . [C]learly the testimony of Miss Burt at trial was in no way the fruit of the Ramada Inn discussion." The court recognized the dangers of meeting with a defendant without his counsel, especially when co-defendants are represented by the same counsel, but it held that in this case the contact with Blair was not "improper." The meeting was sought by Burt and not by the government, and it was arranged with Burt, not Blair, who made only "gratuitous" comments that were not used at trial.

We agree with the district court. We are satisfied with the district court's careful inquiry to determine whether any evidence derived from the meeting was used by the government, and with its conclusion that no evidence presented at trial was gained from the meeting. Accordingly, any error committed by the government was harmless whether measured by the ordinary or by the constitutional standard.

Of course, as a general matter, an attorney should not communicate directly with a party whom he knows to be represented by an attorney without the consent of the lawyer. *See* American Bar Association Code of Professional Responsibility, Canon 7, D.R. 7–104(a)(1). Here, however, the meeting was arranged primarily between government agents and Burt, who was not under indictment. The government did not seek the meeting. Government attorney Wampler testified that he believed that Blair particularly wanted to keep his attempts to secure immunity from the other defendants and the counsel who represented them all jointly. *Cf. Arrington v. Maxwell,* 409 F.2d 849, 853 (6th Cir. 1969). However, the government did not take the precautions that were possible. It did not encourage or even suggest to Blair that he should either

notify Henry or arrange for the appointment of independent counsel who could be present. Although we disapprove of this practice, it bears little resemblance to the outrageous prosecutorial conduct which required reversal in cases cited by appellants. *E.g., United States v. Rispo,* 460 F.2d 965 (3rd Cir. 1972).

## III. DID THE DISTRICT COURT ERR IN ADMITTING CHALLENGED EVIDENCE?

Appellants also seek to overturn their convictions on the basis of several rulings by the district court admitting challenged evidence. They contend that the wiretap evidence that figured so prominently in the prosecution's case was inadmissible, first because the government's application was not properly authorized, and also because the application did not meet several statutory requirements. Appellants seek the suppression of the evidence seized at the Hubbell Street house, and from appellants Jones, Hurt, and Woods at the time of their arrests, on Fourth Amendment grounds. Appellants contend that voice exemplars that they were required to give were inadmissible on both Fourth and Fifth Amendment grounds. And finally, they contend that the testimony of Agent Garibotto identifying the voices on the tapes was inadmissible because it was the fruit of informal "aural show ups" which violated appellants' Fourth, Fifth, and Sixth Amendment rights.

### A. Wiretap Evidence.

The intercepted communications were critical items of proof in the government's case, and appellants contend that the district court erred in refusing to suppress the evidence seized by the interception. They challenge the validity of the authorization for the government's application for a wiretap order.[10] They also argue that the application did not demonstrate that normal investigative procedures would have been inadequate, nor did it afford the district

---

**10.** Appellants' challenge applies both to the original application and to the application for

the extension. Our discussion applies to both as well.

judge probable cause to believe that the telephone to be tapped was being used or was about to be used for one of the offenses specified in the wiretap statute.

1. The Authorization for the Application for the Wiretap Order.

Appellants argue that the wiretap evidence should have been suppressed because the government's application for the interception order lacked the authorization required by the statute. 18 U.S.C. § 2516(1) provides that:

> The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for . . . an order authorizing or approving the interception of wire or oral communications . . .

In this case, the written application and the application for an extension stated that Attorney General Mitchell had specially designated *Acting* Assistant Attorney General Henry Peterson to authorize the application to the federal court, and Peterson's letter was attached.

██ After their indictment, appellants moved to suppress the wiretap evidence on the ground that an *acting* assistant attorney general had no authority to authorize wiretaps pursuant to § 2516. Appellants argue that the applications were insufficient on their face. Section 2518(10)(a)(ii) provides that the contents of intercepted communications may be suppressed on the ground that "the order of authorization or approval under which it was intercepted is insufficient on its face."

In *United States v. Vigi,* 515 F.2d 290 (6th Cir.), *cert. denied,* 423 U.S. 912, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975), our court considered this argument and held that it was unnecessary to determine whether an *acting* assistant attorney general who signed the letter authorizing the application could give effective approval under § 2516, because the Attorney General himself had actually approved the application. *Accord, United States v. Swann,* 526 F.2d 147 (9th

Cir. 1975); *United States v. Acon,* 513 F.2d 513 (3d Cir. 1975); *United States v. Robertson,* 504 F.2d 289 (5th Cir. 1974), *cert. denied,* 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975). The same situation is present in this case. The district court found that Peterson had submitted the papers supporting the request for authorization to Attorney General Mitchell, and that Mitchell himself approved the application. The government submitted the affidavit of Sol Lindenbaum who stated that the Attorney General had approved the request for authorization to apply for wiretap orders. Attached to this affidavit were copies of a memorandum from Mitchell to Peterson. In his deposition Lindenbaum identified the handwritten initials on the memos as Mitchell's. Judge Kennedy, who issued the wiretap orders, was told that Mitchell had approved the application.

Appellants also contend, however, that Attorney General Mitchell's internal memoranda were ineffective because 28 C.F.R. § 0.180 required the designation of formal orders. Appellants contend that this section is applicable by its own terms to all documents relating to "the assignment . . . or delegations of authority, functions, or duties by the Attorney General." These documents are to be designated as formal "orders" to be issued by the Attorney General in a numbered series. This section is not applicable to delegations of the special authority over applications for interception orders, or to the Attorney General's personal approval of an application for an interception order. Other courts have found even verbal approval by the Attorney General to be sufficient. *United States v. Falcone,* 505 F.2d 478 (3d Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975).

██ Appellants also contend that the affidavit in support of the application for the wiretap failed to make the averments required by 18 U.S.C. § 2518(1)(c). Section 2518(1)(c) requires that an application for an electronic surveillance order contain a "complete statement as to whether or not

other investigative procedures have been tried and failed or why they appear to be unlikely to succeed if tried or to be too dangerous . . . ." We hold that the affidavit of Agent Garibotto was a satisfactory statement of the investigative steps taken to date, and that it affords a sufficient reason why normal investigative procedures "appear to be unlikely to succeed." [11]

■ However, appellants argue that the averments were false and misleading because a government informant, Roosevelt Nabors, had been asked to become a lieutenant in the organization, but had refused on the advice of government agents. This opportunity for infiltration, they argue, would have permitted the government to investigate the organization by normal procedures. The affidavit did not discuss the invitation for Nabors to become a lieutenant. The district judge rejected this argu-

ment because, even as a lieutenant, Nabors would have had difficulty in learning all the complex details of the widespread organization, and its aiders and abettors. Moreover, in view of Nabors' lengthy prior criminal record, the government would have had great difficulty in establishing criminal liability by his testimony alone.

We agree with the district court's analysis. The availability of an informant who was offered and declined an opportunity to penetrate deeper into a criminal organization under investigation did not render insufficient Garibotto's statements of the need for wiretaps to discover and prove the liability of the conspirators. *See United States v. Pacheco,* 489 F.2d 554, 564–565 (5th Cir. 1974), *cert. denied,* 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975).

■ Appellants' final contention regarding the wire interception is that the affidavit submitted with the application for the

---

11. Agent Garibotto's affidavit stated in part:

19. Normal investigative procedures have not succeeded in establishing the full extent of the activities of Eddie JACKSON and George BLAIR relating to their purchase or sale of controlled substances, nor has Eddie JACKSON's and George BLAIR's source of supply been identified or established. Based on my knowledge and experience as a Special Agent of the Federal Bureau of Narcotics and Dangerous Drugs, and the experience of Supervisory Agents and other Special Agents of the Bureau of Narcotics and Dangerous Drugs, normal investigative procedures reasonably appear to be unlikely to succeed in establishing the identities of Eddie JACKSON's and George BLAIR's co-conspirators, aiders and abettors, their places of operation for their transportation of controlled substances to the Detroit, Michigan area and for their manufacture and distribution of controlled substances within the Detroit, Michigan area, and their times, places, schemes, and manners for selling, buying, possessing, concealing, delivering, distributing, or paying for controlled substances. My experience and the experience of other Federal Agents has shown that narcotics (controlled substance) raids and searches have not, in the past, resulted in obtaining evidence of who the raided violator's co-conspirators, aiders and abettors were, and where their places of operation were to transport controlled substances into an area or manufacture or distribute controlled substances about an area. Experience has shown that controlled sub-

stance manufacturers and distributors do not keep records of their controlled substance actions. It is the experienced belief of Special Agents of Region VI that additional surveillances of JACKSON's and BLAIR's and his operation, if continued on a regular basis, will jeopardize the outcome of the investigation, and will do little to reveal the manufacture and distribution network. JACKSON and BLAIR are extremely surveillance conscious and have two men on duty outside 19315 Hubbell to spot surveillance units. Special Agent Smith has been unable to move any further vertically or horizontally in the JACKSON/BLAIR operation because of JACKSON's and BLAIR's extreme caution. S–1 does not personally know anymore facts concerning the JACKSON/BLAIR operation.

20. For the reasons set out hereinabove, all normal avenues of investigation are closed, and it is my belief that the only reasonable way to develop the necessary evidence to discover the other persons involved in the JACKSON/BLAIR manufacture and distribution of controlled substances network, and their locations and schemes of operation, is to intercept wire communications from the telephone utilized by Eddie JACKSON and George BLAIR located in the premises at 19315 Hubbell, Detroit, Michigan, and carrying telephone number 313–864–4854, which has been, is being, and is about to be used by Eddie JACKSON, George BLAIR and others as yet unknown, in connection with the commission of the above-described offenses.

wiretap order did not meet the requirement of 18 U.S.C. § 2518(3)(d) that it afford the district court "probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of [an offense specified] . . . ." Appellants contend that the application failed to establish probable cause to believe that the telephone in the house on Hubbell Street was being, or was about to be, used to facilitate the distribution of narcotics.

The affidavit recited that on two separate occasions, on October 22 and November 4, a government informant, who consented to having government agents monitor his conversation, called the number registered to the Hubbell Street address and set up a sale at the Hubbell Street house, and the purchased substance was tested and found to be heroin. During the exchange, the agent observed the telephone ring a number of times. He saw appellants Blair and Brown answer the calls. Additionally, Garibotto averred that based upon his experience in narcotics investigations, a telephone was regularly used to negotiate the time, place, and manner of "selling, buying, possessing, concealing, delivering, distributing, or paying for controlled substances."

On review, we must view the affidavit in a common sense fashion, and we think that it afforded probable cause to believe that the telephone at the Hubbell Street address was being used to make the arrangements for a series of narcotics transactions. This is sufficient to satisfy the requirement of § 2518(3)(d).

2. The Arrests of Appellants Jones, Hurt, and Woods.

We next consider the legality of the arrests of appellants Jones, Hurt, and Woods as they left Hubbell Street on the night of December 15. Appellants argue that the government lacked probable cause to make these arrests, and that the evidence seized at the time of the arrests must be suppressed. Earlier in the evening of the night

of the arrests, the agents monitoring the Hubbell Street telephone tap overheard conversations indicating that an expected shipment of narcotics had arrived. Accordingly, a large number of government agents took up surveillance posts near the Hubbell Street house and arrested appellants as they left the structure.

The government intercepted a call from Joe Weaver to appellant Jones about 9 p.m. Weaver told Jones that "Courtney [Brown] wants to see you." Garibotto was informed of this call, and he instructed Agent Smelter that Jones was a close associate of Jackson, and that he should be arrested as he left Hubbell Street.

Agent Dockery testified that he actually arrested Jones. There was no evidence that Dockery knew that Garibotto had identified Jones as a close associate of Jackson's who should be arrested. Dockery testified that when he arrested Jones, he knew that the wire interception indicated that a large shipment of narcotics was concealed at 19315 Hubbell Street, that Weaver had called Jones and told him that Courtney wanted to see him, and that Jones was identified by another agent when he arrived at Hubbell Street. Dockery testified that based on their knowledge of the large quantity of narcotics hidden on the premises, he and the other agents had conferred and determined that anyone seen entering and then leaving 19315 Hubbell would be stopped and searched "on the probable cause that they would be carrying narcotics." He observed Jones' car pull up to the house, and saw its two passengers enter 19315 Hubbell. They departed about five minutes later. Dockery followed them for a short distance, then arrested them. A search revealed that Jones had concealed four cellophane bags containing about one pound of heroin each inside his shirt at the waistband. The evidence of the 1,924.5 grams of heroin was the basis for counts 6 and 10, distribution and possession without intent to distribute heroin.

Agents also intercepted a call from Blair to appellant Hurt on December 15. Blair stated that the heroin was on hand. Hurt

wanted a kilogram, and he was told that he would have to pay cash. Hurt asked the price, and Blair stated that he would call him back. Garibotto was informed of the call, and he stated that Hurt was a substantial customer, and if he came he should be arrested as he left.

Hurt was arrested by Agent Cigich, who testified that "supervisory agents" told him to maintain surveillance at Hubbell Street, and

> should any individual that had arrived at that address get back into their [sic] vehicles and depart, to apprehend and place under arrest the individual.

Hurt arrived and entered 19315 Hubbell. When he departed, Agent Cigich followed and arrested him some distance away. Cigich testified that he found a small packet of white powder "inside the car, lying on the floor next to the driver's front seat." The powder was tested and found to be .268 grams of heroin. Apparently Hurt was the driver and only person in the car at the time of the arrest. The heroin was offered into evidence in support of appellants' convictions on counts 7 and 11, possession and possession with intent to distribute .268 grams of heroin.

There was testimony that agents observed Woods arrive at 19315 Hubbell at about 9:40, and leave a few minutes later. He was arrested by Agent Goldenbaum. Goldenbaum testified that he had been informed by agents monitoring the wiretaps that a narcotics shipment had arrived at Hubbell Street and was being rapidly distributed. He was told to get into a radio car and take up a surveillance position. He learned that at about 9:30 two persons had been arrested leaving the premises, and were found to have suspected narcotics in their possession. At about 9:40, he was informed by radio that a 1969 Chrysler was parked in front of the Hubbell Street house, and he was told to follow it when it left and to arrest appellant Woods. A package containing 37.66 grams of cocaine and 137.5 grams of heroin was found in the pocket of his jacket. Additionally agents seized $4,809 in cash and a pistol. This evidence

was the basis of counts 8 and 9 charging distributing the heroin and cocaine, and supported the conspiracy charge.

The district court upheld each of these arrests. The court held that it was reasonable for the arresting officers to assume that the Jones who was identified arriving at Hubbell Street was the Jones who had called earlier and whom Garibotto had ordered arrested. The court held that although no one actually identified Hurt prior to his arrest, "the officers had enough facts to determine that the man they arrested was Leo Hurt, Jr., and *probably* he was violating federal narcotics statutes." Although there was no intercepted telephone call to Woods, the district court held that the agents had probable cause because they knew that the Hubbell Street house was being used as a distribution site for narcotics on the night of December 15. The court reasoned that it was extremely unlikely that a person would come to the distribution center on that night except for the purpose of illegal narcotics trafficking. Moreover, the agents knew that it was common practice in the narcotics trade to dispense a shipment quickly. Accordingly, when they saw Woods arrive and depart after only a few minutes—just as Jones and Hurt had done a few minutes earlier—they had probable cause to believe that Woods, too, would have narcotics in his possession when he left.

Neither Garibotto's knowledge about Jones and Hurt nor his orders for their arrests can be relied upon to provide probable cause for their arrests, because there was no evidence that any of his comments had been communicated to the agents on the scene who actually made or ordered their arrests.

 The government contends that the information known to a superior officer may be imputed to the arresting officer, *citing United States v. Trabucco,* 424 F.2d 1311, 1315 (5th Cir. 1970), *cert. denied,* 399 U.S. 918, 90 S.Ct. 2224, 26 L.Ed.2d 785 (1970), and that the collective knowledge of agents working as a team is to be considered together in determining probable

cause. *E. g., United States v. Canieso,* 470 F.2d 1224, 1230 n.7 (2d Cir. 1972); *United States v. Stratton,* 453 F.2d 36 (8th Cir. 1972), *cert. denied,* 405 U.S. 1069, 92 S.Ct. 1515, 31 L.Ed.2d 800 (1972). When a superior officer orders another officer to make an arrest, it is proper to consider the superior's knowledge in determining whether there was probable cause. Likewise, when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest. But here, in contrast, because there was no evidence that Garibotto's order to arrest either Jones or Hurt was the basis of their arrests, his knowledge cannot be considered in determining probable cause. On the other hand, we do mutually impute the knowledge of all the agents working together on the scene and in communication with each other. Therefore it was proper to consider not only the facts known to Agent Goldenbaum when he arrested Woods, but also the information known to the officers who saw Woods visit 19315 Hubbell and ordered Goldenbaum to follow and arrest him.

When Dockery arrested Jones, he knew that Jones had received a call from the Hubbell Street telephone that evening, that narcotics were believed to be concealed on the premises, and that the person he saw enter and leave the premises was known to another agent on the scene as Alphonzo Jones. Dockery testified that he had conferred with the other agents on the scene and determined that anyone who visited 19315 Hubbell Street was likely to be carrying narcotics when he left. The district court's discussion of Woods' arrest indicates that it determined that the agents on the scene knew that 19315 was being used as a narcotics distribution center that evening, and we assume that Dockery learned as much from his conference with the other agents.

These facts are sufficient to afford probable cause to believe that Jones had been trafficking in heroin. Of course if the government had offered evidence that the agents on the scene were aware of Jones' close association with Jackson at the time of the arrest, this additional evidence would have strengthened the probable cause. Mere presence at a place where the government believes illegal drugs will be distributed will not provide probable cause for an arrest on narcotics charges. *See Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). But here we think that the agent who made the arrest did have reason to believe that it was more likely than not that Jones was in possession of narcotics when he left 19315 Hubbell. 19315 was a story-and-one-half bungalow, and agents knew that it was used as a headquarters and distribution site for narcotics. They also knew that a large shipment of narcotics had arrived. Since Dockery had a conference with the other agents, and knew of the call to Jones, we think that it is legitimate to assume that he knew that the wiretap indicated that the shipment was to be distributed to callers *that evening.* In this circumstance, as the district court reasoned in connection with Woods, it was more likely than not that a visitor on the night of December 15 was there to pick up narcotics, especially when he had been called earlier that night from the Hubbell Street address. Accordingly, the arrest was lawful and the evidence seized from Jones was properly admitted.

In the case of appellant Hurt, the same reasoning applies. Agent Cigich testified that he made the arrest because of a general order by his supervisors to arrest anyone leaving 19315 Hubbell that evening. Although the government did not prove that the call from Blair to Hurt negotiating the sale of a kilogram had been communicated to Cigich or to the other agents on the scene, we assume that the supervisory agents who gave these orders knew of the anticipated distribution from the Hubbell Street house *that evening.* As in the case of appellant Jones, there was probable cause to arrest Hurt immediately after his brief visit to the house. The totality of the circumstances suggested no reason for his

presence other than to engage in narcotics traffic.

In the case of appellant Woods, moreover, the agents had more than simply the expectation that 19315 Hubbell was to serve as a distribution site that evening. They also knew that two other persons who had arrived shortly before Woods had been arrested and were found to have suspected narcotics in their possession. Additionally, as the district court noted, the agents knew that once a narcotics shipment arrives it is distributed very quickly. In these circumstances, we agree with the district court that the facts known to the officers who ordered the arrest of Woods, and of which they had reasonably trustworthy information, " 'were sufficient to warrant a prudent man in the belief that [Woods] had committed or was committing an offense.' " *Adams v. Williams*, 407 U.S. 143, 148, 92 S.Ct. 1921, 1925, 32 L.Ed.2d 612 (1972), *quoting Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

Accordingly, we hold that the evidence seized at the arrests of appellants Hurt, Jones, and Woods was legally seized, and was admissible to prove their guilt. Since we find that there was probable cause for the arrest of Cara Woods, the evidence seized at the time of the arrest was admissible, and we have no occasion to consider whether the statements he later made were independent of his arrest.

### B. The Evidence Seized from the Hubbell Street Premises.

A large quantity of narcotics was seized from the house on Hubbell Street on December 15, shortly after the arrests of appellants Jackson, Brown, Blair, and Joseph and Reginald Weaver. Appellants contend that these arrests were purposely delayed until appellants were inside the Hubbell Street house, and that they were used as a pretext for making a search of the premises without a warrant.

The arrests were made at approximately 10 p.m. on December 15. According to the testimony at the suppression hearing, about 6 p.m. that evening, government agents who were monitoring the Hubbell Street wiretaps informed Agent Garibotto that several calls suggested that a long awaited shipment of narcotics had arrived. Garibotto testified that he and government attorneys immediately began to prepare affidavits in support of a search warrant for Hubbell Street. Since these calls also indicated to Garibotto that buyers had arranged to come to Hubbell Street, he ordered the agents in the Hubbell Street vicinity to be alerted for the buyers' arrival. At approximately 9:45 Garibotto, who was on the way to the home of a district judge to present the affidavits, was notified of the arrests of Jones, Hurt, and Woods as they left Hubbell Street. He was also told that each of them was found to be in possession of narcotics when arrested. At that time Garibotto ordered the agents on the scene to arrest Jackson and the others found in the Hubbell Street house. At approximately 10 p.m. at the home of the district judge, when he was notified that the arrests had been made, and that suspected narcotics had been found in plain view, he added this information to the affidavit. The district judge issued a search warrant for the house on Hubbell Street, and a full search was made pursuant thereto. A large quantity of narcotics was found and was later introduced into evidence at appellants' trial.

Appellants contend that Garibotto purposely ordered the arrests to be made at the Hubbell Street house as a subterfuge to permit a search of the premises without a warrant. Garibotto denied that he delayed the arrests for that reason. Both appellants and the government rely upon Garibotto's statement of his purpose for ordering the arrests at that time. He testified:

> Well, the circumstances at the Hubbell address mandated that the arrest be made at that time. Our forces were diffused at the time. We knew there were a great number of customers heading to the Hubbell address to purchase heroin and cocaine. We made three arrests, there were three seizures. We knew that

our forces were spread around the immediate vicinity. We were just concerned that the evidence that was on hand at Hubbell would be distributed to the streets and would not be seized.

The district court upheld the seizure of the challenged evidence on two grounds. First, it held that

[d]espite substantial testimony about the arrests themselves at Hubbell, no persuasive facts were presented to support defendants' allegation that Jackson could have been arrested prior to his entering the house on Hubbell.

Additionally, the court held that even assuming that the agents had improperly delayed the arrests to gain entry into the house without a warrant, the search that was later conducted pursuant to a warrant was not tainted. The court reasoned that the district judge, who received lengthy affidavits prepared *before* the arrests (to which only one handwritten paragraph had been added *after* the arrests), had before her sufficient unchallenged facts to afford probable cause for a search. The improper addition could therefore be ignored.

Our court has repeatedly made it clear that:

An arrest may not be used as a pretext or subterfuge for making a search of premises without a search warrant where ordinarily one would be required under the Fourth Amendment. If, in fact, the primary purpose of forcibly entering a person's home is to search for evidence with which to convict him of crime, the evidence so obtained is not admissible in court.

*United States v. Harris,* 321 F.2d 739, 741 (6th Cir. 1963), *quoted in United States v. Carriger,* 541 F.2d 545 (6th Cir. 1976, decided and filed, August 25, 1976) [footnote omitted]. As Chief Judge Cecil stated in *Harris,*

The real purpose of the agents must be determined from all of the facts and circumstances surrounding the arrest of the defendant and the search of his apartment. The court is not bound to accept

the purpose as stated by the agents as controlling.
321 F.2d 741.

Appellants argue that probable cause to arrest Jackson, Brown, and Blair existed after the October 22 and November 4 sales to the undercover agent. Moreover, they emphasize that Jackson was under government surveillance before he arrived at Hubbell Street, but he was not arrested until *after* he was on the premises. They argue that Garibotto's statement quoted above admits that his purpose in ordering the arrests was to permit the warrantless search and seizure of narcotics.

Although the district court did not focus on the issue as stated in *Harris,* its determination that the defendants did not prove that Jackson could have been arrested sooner implies that the government did *not* make the arrests as a pretext for a warrantless search. The arrests were ordered as soon as the buyers who had called earlier left the premises, were arrested, and were found to be in possession of narcotics. Taken with the reports of the outgoing calls from Hubbell setting up additional sales, this firmly established that the narcotics shipment had arrived and that the occupants of the house were distributing it rapidly. This knowledge afforded probable cause to arrest all the occupants of the house, not just Jackson. Moreover, we think that Garibotto's testimony indicates that there was real concern for preventing the unlawful distribution of a large shipment of narcotics to other purchasers, as well as a desire to effect the arrests while there was sufficient manpower available. The record does not indicate that the government was trying to avoid getting a warrant to search Hubbell Street. In fact, when Garibotto ordered the arrests he was on his way to the home of a district judge with detailed affidavits, and he added only a brief handwritten statement after he learned of the arrests. The district judge actually issued a warrant within minutes of the entry and arrests. No search of the premises was made until the warrant was issued.

The facts and circumstances surrounding the arrests thus demonstrate that the government did not manipulate the arrests in order to avoid the Fourth Amendment warrant requirement, and we hold that the evidence seized from Hubbell Street was properly admitted.

## C. Formal Voice Exemplars.

■ Appellants contend that the district court's order requiring them to give formal voice exemplars violated their privilege against self-incrimination and constituted an illegal search and seizure. Accordingly, they argue that neither the exemplars nor identification testimony based upon the exemplars was admissible. In *United States v. Franks,* 511 F.2d 25, 32 (6th Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975) we rejected these arguments, holding:

Mitchell and Britton claim that the court order compelling them to give voice exemplars violated their constitutional right against unreasonable searches and seizures and their constitutional privilege against self-incrimination. *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), established that compelling voice-prints even of the same words used in the crime does not violate the constitutional privilege against self-incrimination. Accord, *United States v. Rogers,* 475 F.2d 821, 825–826 (7th Cir. 1973). Moreover, compelling a voice-print is neither a "search" nor a "seizure." *Dionisio,* 410 U.S. at 14–15, 93 S.Ct. 764. We reject Mitchell's attempt to limit *Dionisio* to the grand jury context in that, so long as the underlying seizure of the person is proper, requiring that person to submit voice exemplars violates no constitutional rights. See *United States v. Rogers,* 475 F.2d 821 (7th Cir. 1973) (court-ordered submission); *United States v. Sanders,* 477 F.2d 112 (5th Cir.), cert. denied, 414 U.S. 870, 94 S.Ct. 88, 38 L.Ed.2d 88 (1973) (legally in custody on another matter).

## D. Informal "Aural Show Ups."

■ Appellants also contend that their Fourth Amendment rights and their privilege against self-incrimination were violated, and their Sixth Amendment right to counsel denied, at a series of informal "aural show ups." Appellants allege that government agents created opportunities to speak to each of the appellants both in person after their arrests, and later over the telephone by setting up a lengthy procedure for the return of their seized property. Agents testified that they did not give the warnings detailed in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), when they spoke to appellants on these occasions,[12] and appellants did not have their counsel present.

As we stated in connection with the formal voice exemplars, *supra,* neither the Fourth Amendment nor the privilege against self-incrimination is violated by the disclosure, even if compelled, of a person's voice. Appellants' complaint is not that their statements were used to incriminate them in a testimonial sense, but that the agents were able to recognize their voices on the tapes after having heard them in person and over the telephone.

Appellants also claim, however, that because the "aural show ups" formed the basis for the critical testimony identifying their voices on the tapes, they were critical stages at which the Sixth Amendment guaranteed appellants' right to counsel. A review of the testimony indicates that Agent Garibotto did speak to several of appellants briefly after their arrests, and later over the telephone. These conversations appear to have been brief and matter of fact, concerning such routine matters as the return of property which had been seized. There is no requirement that counsel be present for conversations about such routine matters when no effort at interrogation is made.

---

12. Appellants do not contend that they were not given their *Miranda* warnings before formal custodial interrogations.

## IV. WAS THERE SUFFICIENT PROOF OF APPELLANTS' GUILT ON EACH OF THE COUNTS?

Next we consider the sufficiency of the proofs supporting appellants' convictions on the various counts of the indictment. First, appellants assert that the *Pinkerton* rule should not be applied to convict defendants, found to be conspirators, of each of the substantive counts without proof that each defendant actually took part in the individual transactions. Second, several appellants challenge the sufficiency of the evidence linking them to the conspiracy. Last, we will consider challenges to the proofs on counts 3, 4, 8 and 9.

### A. The Pinkerton Rule.

■ Appellants vigorously attack the validity of the rule announced in *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), that even if he did no more than join a conspiracy, a conspirator can be convicted of any substantive offense committed in furtherance of the conspiracy and as a part of it. Appellants contend that the *Pinkerton* rule is bad law, and that this court should not follow it. Our court, however, is constitutionally required to follow the Supreme Court's decision in *Pinkerton* and the cases following it, which have never been overruled, or even questioned by the Supreme Court.

### B. The Sufficiency of the Evidence of Conspiracy.

■ Appellants Kilpatrick, Riggs, Rudolph, Cavanaugh, Horne, Hurt, and Garrett challenge the sufficiency of the evidence supporting their convictions. Since each of them was found guilty of conspiracy, count 1, under the *Pinkerton* rule, they could also be convicted of counts 3 and 4 and counts 6 through 16, which charged crimes that were part of and in furtherance of the conspiracy. Appellants contend, however, that there was insufficient evidence to support their convictions on the conspiracy charge.

In reviewing the sufficiency of the proof of appellants' guilt, we will be guided by the following general principles. The evidence will be viewed in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Moreover, there are special evidentiary rules applicable to conspiracy cases. As we stated in *United States v. Mayes,* 512 F.2d 637, 651 (6th Cir.), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975):

> a prima facie case of the conspiracy and the defendant's connection with it must be established by evidence independent of that offered as an admission of a co-conspirator. . . . However, a prima facie case is less than proof beyond a reasonable doubt; indeed, it is less than a preponderance. . . . Moreover, the prima facie case need not be established before the proffered hearsay may be admitted; the judge may admit it conditionally. It is sufficient if at the close of the government's proofs, a prima facie case of conspiracy and the defendant's connection with it has been established by "independent or disassociated evidence."

Applying these principles, we turn to the evidence that is claimed to support the finding that each of these appellants was a conspirator.

### Willie Lee Kilpatrick

Appellant Kilpatrick was convicted of conspiracy, count 1, by Judge Pratt, and under the *Pinkerton* rule he was also convicted on counts 3, 4, and 6 through 16. We hold that the evidence was adequate to support his conviction on the conspiracy count, and we have already discussed the *Pinkerton* rule *supra.* The following evidence supported the district court's conclusion that Kilpatrick "was involved in narcotic trafficking, was clearly associated with defendant Jackson and connected with the other conspirators . . . [and] was in the 'lieutenant' echelon of the Jackson organization. . . ." Kilpatrick flew to New York with appellant Riggs (Jackson's girlfriend), who was arrested carrying a quantity of narcotics when she attempted to return to Detroit. Informant Nabors

testified that he observed Kilpatrick at 19315 Hubbell Street at the time scheduled for a meeting of the Jackson organization lieutenants. When Nabors refused the organization's invitation to become a lieutenant, he was not allowed to stay. A search of Kilpatrick's apartment produced substances used to dilute heroin, narcotics paraphernalia, and firearms. Kilpatrick's address book listed the names of other conspirators, and he was likewise found listed in their books.

## Leo Hurt

Judge Feikens convicted appellant Hurt on count 1 because he found beyond a reasonable doubt that Hurt purchased from the Jackson organization large quantities of narcotics for wholesale distribution. The district court took special note of a call that Hurt made to Blair in which Hurt stated that his customers were complaining about the quality of the narcotics he had sold them. Judge Feikens observed that Hurt was mentioned in the telephone and address books of several of the conspirators. Finally, Hurt was called to the Hubbell Street house on December 15 when the large shipment was being distributed, and he was arrested with heroin in his possession when he left. Although the heroin was found in Hurt's car, not on his person, there was ample evidence to support a finding of possession, since he was apparently the only person in the car, and the heroin was found on the floor by the driver's seat. This evidence is sufficient to support the conclusion that Hurt, like Cavanaugh and Rudolph, was a major distributor for and a member of the conspiracy. Accordingly, we affirm Hurt's conviction on count 1. Under the *Pinkerton* rule, the conviction on count 1 permitted his conviction on the counts charging the substantive crimes committed in furtherance of the conspiracy as well, including count 7. Accordingly, we need not discuss Hurt's argument that there was insufficient evidence to convict him on count 7, although we conclude that even without the *Pinkerton* rule, there was sufficient evidence to sustain his conviction on this charge.

Hurt also contends, relying upon *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), that the evidence shows only a "hub and spoke" cluster of several conspiracies, each between an individual dealer and the "hub" consisting of Jackson and his lieutenants. In *Kotteakos,* however, defendant Brown specialized in obtaining loans from the Federal Housing Administration by false and fraudulent applications. Several defendants, each of whom had obtained such a loan falsely and fraudulently, were charged with and convicted of a single all-encompassing conspiracy. The Supreme Court held that there was proof, not of a single, but of several conspiracies, and reversed the convictions.

Hurt, however, was a distributor with an ongoing relationship with the conspiracy to distribute illegal narcotics. He depended for his success upon the continuing vitality of the entire conspiracy. This is particularly true in the narcotics business, because new customers of each seller may become, by reason of addiction, a lifetime potential market for all other sellers.

## Fairh Lee Riggs

Judge Feikens convicted appellant Riggs of conspiracy, count 1, concluding that she knowingly and intentionally joined the conspiracy, and that she was "an important courier in the transportation of narcotics" as well as "an intimate associate of Jackson." We hold that the evidence was sufficient to convict Riggs of conspiracy. Riggs had traveled to New York with appellant Kilpatrick and defendant Reynolds in September 1971. All three used assumed names. When airlines personnel examined appellant Riggs' carry-on luggage, they observed an estimated $30,000 in cash in a paper bag. Riggs was arrested later that day when she returned to the New York airport for a return flight to Detroit. Her luggage contained 1,917 grams of heroin and almost $5,000 in cash. She was convicted of possession of the heroin in the Eastern District of New York, and the conviction was affirmed. *United States v. Riggs,* 474

F.2d 699 (2d Cir.), *cert. denied,* 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973). By stipulation, the record in the New York case was incorporated into these proceedings. Riggs was Jackson's girlfriend. He arranged to take calls from another conspirator at her house. Riggs' name and telephone number, along with those of several other appellants, were found in appellant Rudolph's address book. This evidence was adequate to establish a prima facie case that appellant Riggs knowingly joined the conspiracy. Accordingly, other evidence of hearsay statements by other conspirators was admissible to strengthen the case against Riggs. Burt's testimony indicated that the Jackson organization procured several large shipments of narcotics from a source in New York. Additionally Jackson told Burt that he believed the Riggs arrest must have been a "set-up" because the two men with her were not arrested. Jackson tried to raise a large sum because his "old lady" was in jail in New York, and Blair told Burt that Jackson was trying to find a lawyer for Riggs. This evidence amply supports the conviction of Riggs on count 1.

## Samuel (Eugene) Horne

Judge Feikens concluded that it was "clear beyond a reasonable doubt that defendant Samuel Horne knowingly and intentionally joined the conspiracy." He concluded that Horne's "principal activity" for the organization was "wholesale distribution of narcotics." The government intercepted telephone conferences between Horne and Joseph Weaver, Brown, Blair, and Jackson. In particular, Judge Feikens noted that on December 9 Horne called Jackson and attempted to arrange a sale to a customer who wanted a "full thing" for $15,000. This evidence was more than ample to support Horne's conviction of conspiracy.

## Charles Cavanaugh

Judge Feikens convicted Cavanaugh of count 1, conspiracy, holding that he was one of the organization's "wholesale distributors," and that he "engaged in other kinds of supply activity for the group." Burt testified that she and Blair delivered cocaine to Cavanaugh in exchange for three outfits of clothing. The wiretap intercepted a number of calls from Cavanaugh to the Hubbell Street telephone inquiring abut the availability of narcotics. Cavanaugh indicated his familiarity with various key members of the organization by calling and asking to speak to "George [Blair], Brown, or the big man [Jackson]." In these calls Cavanaugh made arrangements for sales, complained about the quality of the narcotics that he had received, saying at one point that he had had to return his customers' money. On December 14 Jackson agreed to sell Cavanaugh 13 quarters of heroin.

This evidence was more than sufficient to prove Cavanaugh's part in the conspiracy. *See, e. g., United States v. Tramunti,* 513 F.2d 1087, 1112 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Varelli,* 407 F.2d 735, 748 (7th Cir. 1969), *cert. denied sub nom. Saletko v. United States,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972); *United States v. Aviles,* 274 F.2d 179, 188 (2d Cir. 1960).

## Charles Rudolph

Judge Feikens also convicted appellant Rudolph on the conspiracy count. He held that Rudolph was "deeply involved in wholesale distribution of drugs for the group." Judge Feikens cited as evidence Rudolph's telephone calls, his account records, and his automatic telephone dialing cards for other conspirators, as well as the fact that Rudolph was listed in the telephone and address books of other conspirators. In one telephone call, Rudolph told Brown he was "getting low," and he would take a quantity of narcotics being held for another buyer if that transaction did not go through. Brown called Rudolph a few days before the last big delivery to tell him that the narcotics would be around in a few days, and Rudolph said that he would wait. An outgoing call to Rudolph's telephone was made from Hubbell Street on December 15 when the expected shipment was being distributed, but there was no answer.

A search of appellant's home yielded 417 grams of heroin, common diluents, guns, ammunition, and a record book including the names of other conspirators and sums of money. This evidence established a prima facie showing of his status as a conspirator, and made admissible Burt's testimony that Blair told her Rudolph had once been a Jackson lieutenant, but that he "broke away" and now specialized in selling "quarters" of heroin and cocaine. It is immaterial that Rudolph no longer served the Jackson organization as a lieutenant, since he still acted as a major distributor for the organization. The evidence adequately supports his conviction.

Ronald Garrett

Judge Feikens found appellant Garrett guilty of conspiracy on the basis of the following evidence: Garrett's telephone number was listed in Kilpatrick's address book and in Rudolph's telephone and address book, and he had a substantial account listed in Rudolph's account book. Additionally, Garrett figured prominently in a number of intercepted telephone conversations. Since Garrett was not one of the speakers in these conversations, they are admissible to prove the truth of the matters asserted only if a prima facie case is made that Garrett was one of the conspirators. However, Judge Feikens properly relied upon the fact that several of the conspirators mentioned Garrett repeatedly in the course of discussions regarding their narcotics transactions. Evidence that his name was mentioned repeatedly in the context of the narcotics transactions was not hearsay, and was competent evidence tending to show that he was a conspirator. It should be unnecessary to emphasize that proof of an illegal conspiracy is seldom direct. More often, there is only indirect proof of the unlawful agreement. We are required by *Glasser* to view the evidence in the light most favorable to the government. Accordingly, we hold that a prima facie case of conspiracy, although a minimal one, is established by the evidence of the telephone calls, considered together with the address books and Rudolph's account book, which indicated a substantial sum of money for Garrett as well as for other persons shown to be conspirators. Accordingly, the substance of the telephone conversations, in which other conspirators' statements indicated Garrett's deep involvement, was admissible. In addition, Burt's hearsay testimony that she helped Blair make a delivery which he said was for "Five-O" was admissible to prove Garrett's complicity. Burt identified Garrett as "Five-O" at trial. This evidence was adequate to support Garrett's conviction on count 1.

C. Counts 3 and 4.

Appellants Brown, Bell, Riggs, Horne, Garrett, Jones, and Rudolph challenge the sufficiency of the evidence to support their convictions of count 3, the October 22 sale to Special Agent Smith, and of count 4, the November 4 sale. Since we have affirmed their convictions of conspiracy under count 1, appellants were properly convicted of the substantive charges in these counts as well under the *Pinkerton* rule.

D. Counts 8 and 9.

Appellants challenge the validity of convicting them on count 8 (distribution of 137.35 grams of heroin) and count 9 (distribution of 37.66 grams of cocaine) in view of the fact that the district court acquitted Cara Woods, in whose possession the heroin and cocaine were found, of the conspiracy charge. Appellants contend that since Woods was not a member of the conspiracy, his statement to Agent Garibotto regarding the source of the narcotics was hearsay and therefore not admissible to prove the guilt of the conspirators. Accordingly, they argue that there was no proof that Woods had obtained the narcotics from 19315 Hubbell. We disagree. There was compelling circumstantial evidence that the heroin and cocaine referred to in counts 8 and 9 were procured from the Jackson organization at 19315 Hubbell. Woods visited the Hubbell Street address briefly on the night of the 15th of December when a large shipment of narcotics was being rapidly distributed, and when he was arrested just as he left he was

found in possession of the narcotics. Minutes before two other persons had entered briefly, and when they left they too had been arrested and were found to be in possession of narcotics. We think that this is ample evidence to support a finding that the narcotics seized from Cara Woods were distributed by the Jackson organization, and that therefore all of the conspirators could be convicted of counts 8 and 9 under the *Pinkerton* rule.

## V. WERE BLAIR AND HURT DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL?

Appellant Blair argues that although the two defense attorneys who represented all defendants at the trial were very well qualified, he did not receive effective assistance of counsel because of the inherent conflict of interest between their representation of Jackson, the "kingpin" or "boss," and that of minor defendants such as Blair. He argues that he did not even have a fee-paying relationship with the defense attorneys, who were primarily concerned with Jackson. He also contends that conflict arose between himself and the other defendants when proof was introduced about his secret efforts to secure immunity in return for the testimony of Ruth Ann Burt.

However, the record reveals that in open court, Blair declined the tendered option of having his case severed from that of the other defendants, with separate counsel appointed to represent him. Blair was not present in the courtroom for the first five days of trial, and the district court granted the government's motion to sever him. On the sixth day, however, Blair appeared in court, and counsel for all the defendants stated that Blair still wished to be tried with the other defendants. Blair was questioned both by defense counsel and by the court about his willingness to waive his right to be present for the first days of the trial. He waived that right and his right to trial by jury, and agreed to the simultaneous bench trial. He was also questioned as follows:

Mr. Rothblatt: And you also understand on this indictment Mr. Henry and I represent a number of other defendants, as well as yourself, and it's been suggested there is a possibility there may be some confliction, because we represent some of the other defendants; we may not be representing you as effectively as we might be, since we represent other defendants. Now, you understand you have a right to have any other attorney represent you, and if you can't afford a lawyer, the Court will assign a lawyer to you free of charge; do you understand that?
Mr. Blair: Yes.
Mr. Rothblatt: And you agree that Mr. Henry and I and Mr. Halpern will continue with your representation, along with the other defendants in this case?
Mr. Blair: Yes.

Blair first made a claim of ineffective assistance of counsel in a motion for a new trial. The district court held that mere dissension or hostility between defendants does not render their representation by the same counsel inadequate. The court observed that Blair's request to be tried with the other defendants could be treated as a waiver of this objection. Finally, the court determined that his

allegation that his counsel had difficulty keeping his defense at heart is totally without support in the record. It shows that defendant expressly chose his counsel after the court explained his right to be represented by an attorney of his choice and that the attorney chosen ably represented him at all stages of the trial.

■ The Sixth Amendment guarantees the right to counsel in criminal proceedings, and a conflict of interest on the part of counsel representing two defendants may deprive the accused of the effective assistance of counsel. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). However, the mere fact of joint representation does not *per se* establish a denial of the effective assistance of counsel. *United States v. Wayman*, 510 F.2d 1020, 1025 (5th Cir.), *cert. denied*, 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975). Our court

requires a party claiming that joint representation resulted in a conflict of interest to demonstrate that some actual prejudice resulted to him. *United States v. Burkeen,* 355 F.2d 241, 244 (6th Cir.), *cert. denied sub nom. Matlock v. United States,* 384 U.S. 957, 86 S.Ct. 1582, 16 L.Ed.2d 553 (1966); *United States v. Cale,* 418 F.2d 897 (6th Cir. 1969), *cert. denied,* 397 U.S. 1015, 90 S.Ct. 1250, 25 L.Ed.2d 430 (1970).

■ Here appellant identified two grounds of conflict. First, he argues that he was only a minor party, and that counsel was concerned primarily with the "kingpin" of the organization. The record does not bear this argument out. Blair was shown to be one of Jackson's primary aides, or lieutenants, not just a minor figure. Moreover, the district court found, and we agree, that counsel ably represented Blair. Second, Blair contends that the disclosure of his secret attempts to gain immunity drove a wedge between him and the other defendants. Although some of the other defendants may have had reason to feel that Blair had acted disloyally to *them* in a personal sense, he has not demonstrated that this hostility affected counsels' ability to continue joint representation. Blair's defense was not shown to be inconsistent with that of Jackson or the other co-defendants. All, for example, were equally eager to discredit the testimony of Burt, Blair's former wife. We find no actual conflict of interest preventing adequate representation of appellant Blair. Moreover, it would be especially inappropriate for us to infer prejudice from the mere fact of joint representation where, as was the case here, the defendant was advised of the possibility of a conflict of interest, and of his right to sever his case and be represented by separate appointed counsel.

Appellant Hurt also attacks the adequacy of his representation by counsel. Compared to appellant Blair, Hurt was a lesser figure in the conspiracy. Nevertheless, Hurt has not carried his burden of proving the existence of a conflict of interest between himself and the more important conspirators that resulted in actual prejudice to him.

He had more than minimal contacts with the conspiracy, and repeatedly obtained narcotics for distribution.

Hurt concedes that counsel succeeded in securing acquittal for some defendants. He argues that because the trial court concluded that the evidence against him was "not as overwhelming" as against the other convicted defendants, truly adequate representation would have secured acquittal. But the trial court's conclusion is equally consistent with adequacy of representation insofar as it indicates that, unlike most other defendants, Hurt's defense was almost successful.

## VI. WERE THE SENTENCES IMPOSED BY JUDGE FEIKENS IMPROPER?

■ Appellants' final contention is that the sentences imposed by Judge Feikens on the defendants tried before him were improper because they were imposed in deference to community sentiments, and to deter future violators without regard to the "militating" [sic mitigating?] factors in the individual cases. They also contend that the sentences imposed by Judge Feikens were harsher than those imposed by Judge Pratt for identical conduct.

It is well settled that except in the most exceptional circumstances, an appellate court will not disturb a sentence that is within the limits set by statute. The severity of a sentence is normally committed to the discretion of the trial court. *See Dorszynski v. United States,* 418 U.S. 424, 440–441, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974); *United States v. Phillips,* 510 F.2d 134 (6th Cir. 1975). Appellants do not contend and cannot demonstrate that the sentences imposed by Judge Feikens exceeded the maximum limits permitted by statute. Instead, they contend that the sentences were not set with proper regard for the individual circumstances of each defendant, and that they should have been more compatible with those imposed by Judge Pratt. The record, however, indicates that Judge Feikens did take the individual circumstances of the defendants and the enormity of their offenses into consideration in determining

the proper sentences, and we find no abuse of his discretion.

## VII. CONCLUSION.

We have determined that the contentions which we have not treated above do not require discussion. We also observe that it is indeed rare for a lengthy trial not to produce some errors, and this unusual proceeding is no exception to the general rule. In some cases, the cumulative weight of a large number of errors otherwise inconsequential in isolation might render a proceeding unfair. We have examined this record with that possibility in mind and have concluded that in spite of minor errors, this was a fair trial for all appellants.

For the foregoing reasons, the judgments of conviction are AFFIRMED.