EDDIE JACKSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jackson v. Commissioner
Docket No. 4291-75.
United States Tax Court
T.C. Memo 1981-252; 1981 Tax Ct. Memo LEXIS 489; 41 T.C.M. (CCH) 1564; T.C.M. (RIA) 81252; May 26, 1981. Henry B. Rothblatt, for the petitioner. Richard A. Witkowski and Patrick J. Gray, Jr., for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $ 551,774.29 in petitioner's Federal income tax and an addition to tax under section 6653(b) [1] in the amount of $ 275,887.14 for 1971. Due to concessions by the parties, the issues remaining for decision are: 1. Whether petitioner had cash-on-hand in the amount of $ 500,000 on December 15, 1971; 2. Whether respondent properly valued and included in petitioner's income narcotics seized *490 at the time of petitioner's arrest; and 3. Whether petitioner is liable for the fraud penalty under section 6653(b). FINDINGS OF FACT Petitioner Eddie Jackson was a legal resident of Southfield, Michigan, when he filed his petition. He timely filed his Federal income tax return for 1971. Petitioner was the leader of an organization engaged in illegal narcotics trafficking during 1971. Petitioner provided the narcotics to his "lieutenants" who distributed the drugs and returned the proceeds to petitioner. Petitioner paid the "lieutenants" a weekly retainer as well as commissions on the sales. The organization provided heroin and other narcotics to Detroit and other midwestern cities such as Toledo, Cleveland, Flint, and Saginaw. During the year in issue, petitioner's organization distributed a minimum of 20 kilograms of heroin each month. At that time, the heroin had a wholesale cost of $ 20,000 to $ 25,000 per kilogram. The heroin received by petitioner's organization generally was 60 to 70 percent pure. Petitioner would dilute the heroin with lactose to a purity of 2 to 20 percent. The diluted heroin would be sold at the same per unit price at which the uncut *491 heroin was purchased. On December 15, 1971, petitioner and others were arrested in a raid by agents of the Bureau of Narcotics and Dangerous Drugs and other law enforcement personnel at a house located on Hubbell Street in Detroit. During the raid the Government agents conducted an extensive search of that house, including a "structural rearrangement" which involved the removal of wall paneling, fixtures, and portions of the floor. Five kilograms of heroin and other drugs with a minimum cost of $ 84,456.31 were seized at the house where petitioner was arrested. No cash, other than what was possessed by the persons arrested, was found. At the same time, a less extensive search for cash and illicit drugs was performed at petitioner's residence on Westhampton Street. The agents did not engage in structural rearrangement of the Westhampton house but searched only those areas that were easily accessible, such as closets, under beds, dressers, the safe, etc. The search uncovered no drugs, and only a small amount of cash. The agents found $ 5,600 on petitioner's person and $ 600 in his safe. Shortly after his arrest and subsequent release, petitioner went to the office of the *492 Bureau of Narcotics and Dangerous Drugs to secure the return of his personal property seized by the agents. After obtaining the property, petitioner encountered in the hallway Special Agent Garibotto, who was in charge of the search of petitioner's house. Petitioner told Garibotto that the agents had failed to discover $ 500,000 hidden in petitioner's house and that, because they had missed the money, the raid had not hurt him. Petitioner kept no records of his narcotics business in 1971. He maintained no checking accounts, and on January 4, 1971, he closed his only savings account, which as of December 31, 1970, had a balance of $ 448.05. Petitioner conducted all of his financial transactions in cash or cashier's checks. In May 1971, petitioner purchased his Westhampton Street residence with cash or cashier's checks in the amount of $ 65,000. In September of that year, petitioner paid $ 19,924.21 for an apartment building with cash from a paper bag full of currency made up of five-dollar bills, ten-dollar bills, twenty-dollar bills, a few fifty-dollar bills, and some one-hundred-dollar bills. In October 1971, petitioner purchased property with a $ 48,872.66 cashier's check *493 after his tender of the same amount in five-hundred-dollar bills was refused. Petitioner made various improvements, including the installation of a swimming pool, to his residence during 1971. He paid cash or cashier's checks in the amount of $ 199,944.03 for these improvements. On June 22, 1971, petitioner paid $ 29,391.95 in cash for a new Rolls Royce. He paid $ 1,000 in cash for improvements to the car the following month. In July 1971, petitioner purchased a man's diamond ring for $ 24,000 cash. In October of that year, he purchased additional jewelry for over $ 21,000 cash. Petitioner expended $ 164,087.41 for personal living expenses during the taxable year. Petitioner also paid $ 57,300, including a single cash payment of $ 45,000, to Goldfarb Bonding Agency during 1971. On August 19, 1971, petitioner purchased a new Chevrolet Caprice for cash and titled the car in the name of his girlfriend, Fairh Lee Riggs. She was arrested in September 1971 in New York and found to possess 2 kilograms of heroin having a minimum cost of $ 28,946.70. Between March 20, 1972, and April 25, 1972, petitioner paid, in cash or cashier's checks, Federal income tax liabilities *494 for 1971 in the amount of $ 301,920. On June 17, 1972, petitioner was arrested for speeding, and approximately 15 pounds of heroin were found in his possession. Using a source and application method of computation, petitioner reported a net taxable income of $ 570,800 for 1971. Respondent determined that petitioner received additional taxable income in the amount of $ 723,581.10, for a total income of $ 1,294,381.10. Due to concessions by the parties, the only dispute remaining concerns respondent's determination that petitioner possessed $ 500,000 cash on December 15, 1971, and respondent's inclusion of narcotics, in the amount of $ 116,282.82 (consisting of the drugs seized from Fairh Lee Riggs and those seized in the December 15, 1971, raid), in his determination of petitioner's net worth as of the end of 1971. OPINION 1. Cash-on-Hand
Respondent contends that, on December 15, 1971, petitioner had $ 500,000 cash-on-hand. This figure was based upon petitioner's statement to Special Agent Garibotto when petitioner went to the office of the Bureau of Narcotics and Dangerous Drugs to retrieve his personal property taken during the raid. Respondent argues that petitioner's *495 statement is worthy of belief because of numerous cash transactions entered into by petitioner during the year, many of which are detailed in our findings of fact. Moreover, respondent observes that petitioner's occupation required large quantities of readily available cash, and that his sales of narcotics generated vast amounts of cash. Respondent concludes, therefore, that petitioner had access to an almost inexhaustible supply of cash and that the $ 500,000 figure is reasonable. Respondent has introduced considerable evidence indicating that petitioner quite often expended large sums of money, using stacks of small denomination bills. [2] If $ 500,000 in such bills were hidden in petitioner's home, however, we think it likely that the agents searching the house would have discovered some of the cash. It is true that petitioner's Westhampton Street house was not as thoroughly searched as was the Hubbell Street house where petitioner was arrested. Nevertheless, although the agents were looking specifically for cash, they found very little cash at either address other than what was found on the persons arrested. If the agents had believed that such a large amount of cash was hidden *496 at petitioner's house, we think they would have been more thorough in their search. Their failure to do so, coupled with their failure to uncover the alleged cash hoard, casts doubt upon the existence of such a hoard. Indeed, respondent acknowledges that his determination that the hoard existed was based primarily upon petitioner's statement to Special Agent Garibotto in the hallway of the office of the Bureau of Narcotics and Dangerous Drugs. Although we recognize that the statement has some probative value, [3] we do not think it was an accurate statement of the cash possessed by petitioner at that time. Rather, taking into account the circumstances in which the statement was made, we think it was made more as a taunt intended to torment the agent who directed the search of petitioner's house than an accurate statement of fact. *497 Respondent also has introduced testimony, and has argued, that petitioner on several occasions boasted about his wealth and tried to impress others with how wealthy he was. [4] We think this evidence is consistent with our determination that the statement to Agent Garibotto was an exaggeration rather than a factual statement. In addition, although it is clear that petitioner and his organization spent and had access to large sums of cash, we do not think this fact in itself establishes that petitioner possessed $ 500,000 on December 15, 1971. Consequently, we find in the light of all the evidence that respondent erred in determining that petitioner possessed $ 500,000 cash on December 15, 1971. We do not give great weight to petitioner's testimony alone that he did not have $ 500,000 at the time of the raid, but we do take into account the fact that respondent's determination cast on petitioner the burden of proving a negative--that he did not have that much money on hand. His testimony when coupled with all the other evidence convinces us that his taunting claim to have had that sum was a gross exaggeration. *498 We recognize that there is the possibility that petitioner possessed more than the $ 6,200 seized in the raid. [5] Between the date of the raid on December 15, and December 31, 1971, petitioner spent $ 14,409.74 in cash. Petitioner has not introduced any evidence indicating that these expenditures were financed by liquidation of other assets, loans, or income earned subsequent to the raid. Thus, we think it clear that these expenditures were made from cash-on-hand on December 15, 1971. There being no basis in the record to find any additional amount, we find that petitioner, on December 15, 1971, possessed $ 14,409.74 in addition to the $ 6,200, for a total of $ 20,609.74 rather than the $ 500,000 determined by respondent. [6]
*499 2. Inclusion of the Seized Drugs
Respondent included in the computation of petitioner's net worth the cost of drugs seized from Fairh Lee Riggs in September 1971, and drugs seized in the December 15, 1971, raid. Petitioner disputes these inclusions. First, petitioner argues that the narcotics were seized in December pursuant to an illegal entry, making any evidence of their seizure inadmissable. This argument, however, was previously brought before, and rejected by, the Court of Appeals for the Sixth Circuit in United States v. Woods, 544 F.2d 242 (6th Cir. 1976). Thus, petitioner's argument is without merit. Petitioner also contends that respondent erred in determining that petitioner owned the drugs in question. Petitioner, however, has introduced no credible evidence supporting his contention that the ownership of the drugs should be ascribed to someone else. Indeed, the record indicates that the drugs should be imputed to petitioner. Some of the drugs were confiscated from Fairh Lee Riggs, petitioner's girlfriend. She was indicted and convicted as a participant in the drug operation conducted by petitioner. Moreover, the remaining drugs were *500 seized in the raid on the Hubbell Street house where petitioner and his associates were present. The record clearly shows that petitioner was the leader of the operation.Consequently, in the absence of any evidence to the contrary, we agree with respondent that the ownership of the drugs seized in the December 15, 1971, raid should be ascribed to petitioner's own drug operations. Petitioner, finally, argues that respondent's determination that the drugs cost petitioner $ 116,282.82 is erroneous. Apparently, petitioner claims that the drugs which were seized had already been cut so that, although 7 kilograms of heroin and 750 grams of cocaine were seized, the cost to petitioner was only that of one kilogram, or $ 22,000. Again, however, petitioner has failed to introduce any credible evidence supporting his argument. In fact, it is stipulated that the minimum cost of the drugs seized from Fairth Lee Riggs was $ 28,946.70 and from the Hubbell Street house when petitioner was arrested was $ 84,456.31, a total of $ 113,403.01. The credible testimony is that the drugs were not cut at the time they were confiscated. Accordingly, we sustain respondent's determination on this *501 issue. 3. Fraud Penalty
Respondent determined that petitioner was liable for the fraud penalty under section 6653(b). [7] Respondent bears the burden of proof on this issue. Rule 142(b), Tax Court Rules of Practice and Procedure.
Respondent argues that petitioner's underreporting of income indicates that petitioner committed fraud. Respondent also points to the fact that petitioner dealt solely in cash as evidence that petitioner intended to conceal income. Finally, respondent argues that petitioner's failure to include his occupation on his return indicates his fraudulent intent. We hold for petitioner. *502 Petitioner reported $ 570,800 of taxable income in 1971. He computed his taxable income using the source and application method of computation. Although petitioner now concedes that he received more income than he reported, we do not think respondent has shown that any part of that omission was due to fraud. Respondent also has not shown that petitioner's failure to include the cost of the drugs seized from his girlfriend and during the raid was "due to fraud," i.e., a "specific purpose to evade a tax believed to be owing." Carter v. Campbell, 264 F.2d 930, 936 (5th Cir. 1959); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Petitioner's civil tax liability cannot be altered in order to punish petitioner further for his involvement in drug dealing. We think respondent tries to read too much into petitioner's failure to state the nature of his occupation on his income tax return. Moreover, we think it more likely that petitioner dealt exclusively in cash or cashier's checks and kept no records of his business because of the illegal nature of his drug business rather than to enable him to conceal *503 taxable income. Hence, we are not convinced that the underpayments conceded by petitioner and found by us were caused by fraud on the part of petitioner. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.↩
2. For example, respondent has introduced testimony that an agent on behalf of petitioner made a downpayment on a car consisting of 500 one-dollar bills.↩
3. Petitioner argues that this statement should be inadmissible as a violation of his right to counsel under the Sixth Amendment. The Sixth Circuit, however, has already held that petitioner's argument is without merit. United States v. Woods, 544 F.2d 242, 263↩ (6th Cir. 1976).
4. For example, respondent introduced testimony that petitioner claimed to a car salesman that he owned a million dollars worth of real property in Bermuda. It appears from the record that this statement was no more than an idle boast.↩
5. Apparently, petitioner contends that he possessed no cash on Dec. 15, 1971, other than the cash seized in the raid. ↩
6. Petitioner has met his burden of proof to show that respondent's determination of $ 500,000 cash-on-hand on Dec. 15, 1971, was erroneous. Although petitioner may have had more cash than the $ 6,200 seized in the raid, no evidence other than the cash expenditures of $ 14,409.74 exists in the record upon which to support a determination as to the amount petitioner possessed at that time. Therefore, respondent's net worth computation showing cash-on-hand as of Dec. 31, 1971, in the amount of $ 485,590.26 is reduced to $ 6,200. The $ 14,409.74 is reflected in cash expenditures taken into account in computing petitioner's 1971 taxable income.↩
7. SEC 6653. FAILURE TO PAY TAX. (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩